**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **Alexis Scott-Ortiz,** | ) | |
| | ) | No.  **CV-20-238-PHX-DWL** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | November 17, 2020 |
| **CBRE Incorporated,** | ) | 3:00 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DOMINIC W. LANZA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TELEPHONIC MOTION HEARING**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1

2                      **T E L E P H O N I C**
                    **A P P E A R A N C E S**

3

4   For the Plaintiff:
          Martin & Bonnett
5         By:  **Daniel Lee Bonnett,** Esq.
               **Jennifer Nicole Murphey,** Esq.
6         4647 North 32nd Street
          Phoenix, Arizona 85018

7

    For the Defendant:
8         Morgan Lewis & Bockius
          By:  **Robert Jon Hendricks,** Esq.
9         Spear Street Tower, 1 Market Street
          San Francisco, California 94105

10
          Coppersmith Brockelman
11        By:  **Kent S. Brockelman,** Esq.
          2800 North Central Avenue, Suite 1900
12        Phoenix, Arizona 85004

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings begin at 3:00 p.m.)

2          THE CLERK:  Civil case 20-238, Alexis Scott-Ortiz

3    versus CBRE Incorporated.  Time set for telephonic motion

4    hearing regarding defendant's motion to dismiss and compel

5    arbitration and plaintiff's motion to stay.          15:00:33

6          Counsel, please announce your presence for the record,

7    starting with plaintiff's counsel.

8          MR. BONNETT:  This is Dan Bonnett speaking.  Good

9    afternoon, Your Honor.  This is Daniel Bonnett and Jennifer

10   Murphey appearing on behalf of the plaintiff.          15:00:47

11         MR. HENDRICKS:  Good afternoon, Your Honor, my name is

12   R.J. Hendricks with Morgan Lewis & Bockius on behalf of CBRE.

13         MR. BROCKELMAN:  And this is Kent Brockelman, also on

14   behalf of defendant CBRE.

15         THE COURT:  All right.  Good afternoon everybody.          15:01:01

16         This is the time for the motion hearing.  As was

17   mentioned a moment ago, CBRE filed a motion to dismiss and

18   compel arbitration at docket number 18.  Mr. Scott-Ortiz

19   opposes that motion, and also has requested a stay, which is at

20   docket number 23.          15:01:21

21         And as the parties are aware, on November 10th, after

22   soliciting some more information about the status of the EEOC

23   investigation, the Court issued a tentative order resolving

24   both of those motions.

25         So hopefully everybody has a sense of where I'm          15:01:35

CV-20-238-PHX-DWL – November 17, 2020

1    tentatively coming at these issues.

2         I think the way I would like to have the argument go

3    is to start with Mr. Bonnett.  Both sides are movants here, but

4    because the tentative largely comes out in favor of CBRE on a

5    lot of the issues, I think it makes sense to go that way.    15:01:54

6         So I'll start first with you, Mr. Bonnett.

7         MR. BONNETT:  Thank you, Your Honor.  This is

8    Dan Bonnett speaking.

9         Having read the Court's tentative ruling, I would like

10   to focus on two main issues for purposes of the argument this    15:02:07

11   afternoon.  And I think probably the easiest one to begin with,

12   or certainly the most significant one to begin with from the

13   plaintiff's perspective would be the issue regarding the

14   enforceability of the arbitration language.

15        And I'm not going to argue the substantive    15:02:29

16   unconscionability portion of our argument on that issue,

17   because I clearly understand where the Court is coming from.

18   However, I would like to try to perhaps elucidate a little bit

19   more the plaintiff's position on the procedural

20   unconscionability argument, and talk a little bit about    15:02:50

21   *Cooper* -- the case that we cite, *Cooper versus QC Financial*

22   *Services Inc.,* and why we think that that provides a roadmap

23   for analyzing plaintiff's argument on a procedural

24   unconscionability issue and why we think the Court can find on

25   the basis of the strength of this record that the arbitration    15:03:14

1   language in the 2016 offer letter is, in fact -- and the

2   entering into that offer, rather, is procedurally

3   unconscionable on the facts.

4          As *Cooper* points out, that analysis begins with

5   looking at the atmosphere surrounding the signing of the         15:03:38

6   contract and taking into consideration the various unique facts

7   that are presented by in this case Mr. Scott-Ortiz, into why

8   procedural unconscionability should be found here.

9          And looking at *Cooper*, it talks about looking at

10  various things such as the age, education, intelligence,         15:04:04

11  business acumen, experience and the relative bargaining power,

12  which are all laid out in Mr. Ortiz' declaration.

13         I may just truncate his name and call him Mr. Ortiz.

14  I do that when I'm meeting with him.

15         So the notion here in terms of where Mr. Ortiz was         15:04:25

16  coming from I think is worth talking about in terms of where he

17  was, both financially, psychologically and in reality with

18  regard to his return to work in August of 2016.

19         As his declaration points out, he had been out of work

20  for seven months.  He was experiencing substantial financial     15:04:52

21  hardship.  He needed to start working immediately.  And

22  coincidentally, the hiring manager for CBRE, Mr. Jeffrey Hawks,

23  told him that he needed Mr. Ortiz to start working immediately,

24  but he couldn't start until the uniforms were ordered.

25         So the offer letter that Mr. Hawks told Mr. Ortiz         15:05:17

─── **CV-20-238-PHX-DWL – November 17, 2020** ───

1    would be coming was sort of a necessity, if you will, for

2    actually starting work.  And given the financial situation and

3    the circumstances that confronted Mr. Ortiz, as he lays out in

4    his declaration, he signed the offer letter so he could start

5    work.                                                          15:05:41

6          He went on to explain that he was told by Mr. Hawks he

7    had two options, either accept or reject the offer letter

8    through the online portal that he was directed to.  And that

9    those were the only two choices that he had, either to accept

10   or reject.                                                     15:05:59

11         So as his declaration points out, he accepted on the

12   day that he received the offer letter, called up Mr. Hawks and

13   told him he had completed the steps that he been directed to

14   complete so he could start working.  And it was confirmed that

15   the uniforms could be ordered and Mr. Ortiz then was cleared to  15:06:15

16   start working.

17         So the significance, we believe, in terms of those

18   events establish the exigency of the situation that Mr. Ortiz

19   found himself in, what he was told he needed to do to start

20   working, the reason he needed to start working, and the fact   15:06:41

21   that he was not provided an opportunity to bargain over the

22   terms and conditions of his offer, including the language of

23   the arbitration.

24         In fact, as the Court references in the tentative

25   ruling, was told that -- he mentioned that he didn't even know   15:07:01

1    what arbitration was.  He wasn't aware of it, he had no idea,

2    even if he had read that section of the agreement, what it

3    would have meant to him.

4        So those facts seem to parallel pretty closely the

5    facts that are laid out in *Cooper*.                    15:07:19

6        And what's interesting -- and I went back and reread

7    *Cooper* with a more critical eye after reading the Court's

8    tentative ruling.  And what's significant, and I think perhaps

9    needs to be examined perhaps a little more carefully in terms

10   of the takeaway from *Cooper,* while it is clear that the      15:07:42

11   plaintiff in that case was directed to go to arbitration, and

12   arbitration was compelled, that was a 19 -- I'm sorry, a 2007

13   case.

14       And Judge Zapata went through an analysis stating

15   that -- and finding specifically that the procedural          15:08:09

16   unconscionability existed.  However, he points out that the

17   plaintiff in that case argued both procedural and substantive

18   unconscionability, and didn't make an argument that procedural

19   unconscionability alone would be a sufficient defense to

20   preclude the enforcement of an arbitration agreement.         15:08:33

21       And the judge even discussed at that point in time

22   there wasn't a clear indication in Arizona that procedural

23   unconscionability alone would be sufficient.  There was a

24   reference to the *Maxwell* case, the Supreme Court case, that

25   concluded that substantive unconscionability alone would be   15:08:56

1    sufficient, but not specifically mentioning and finding or

2    holding that procedural unconscionability alone would be a

3    sufficient defense, although recognizing that there were other

4    jurisdictions that had reached that conclusion.

5         Subsequently, in 2014 the Division One of the Arizona    15:09:16

6    Court of Appeals in the *Duenas* case that we cite at document

7    23, which is our opposition, at pages 10 through 11, the *Duenas*

8    case did make the conclusion and did come to the conclusion,

9    citing *Maxwell*, that either doctrine of procedural or

10   substantive unconscionability standing alone would be a defense   15:09:42

11   to enforceability of an arbitration agreement.

12        And then three years after that the Division Two of

13   the Court of Appeals in the *Gullett on behalf of the Estate of*

14   *Gullett versus Kindred Nursing Centers* case, cited at page 9 of

15   our opposition, cited *Duenas*, and also reached the same    15:10:06

16   conclusion that the claims of substantive or procedural

17   unconscionability are independent defenses to enforceability.

18        So the question that I have in my mind is whether

19   Judge Zapata would have reached the same result in *Cooper*

20   having had the benefit of the decisions in *Duenas* and the    15:10:31

21   *Kindred Nursing Centers* case.

22        And it would appear, based on a finding of procedural

23   unconscionability alone, the result may have been different.

24   The reason arbitration was compelled there was because the

25   conclusion was that procedural unconscionability standing alone    15:10:49

1   was insufficient.  And then the substantive unconscionable

2   provisions of the agreement regarding the class action waivers

3   could be severed from the arbitration agreement, leaving the

4   remainder of the document and the arbitration provisions not

5   unconscionable substantively.                                    15:11:13

6        So the argument that Mr. Ortiz is making here is is

7   that given in the totality of the circumstances that were

8   unique to him, that were presented to him -- which by the way I

9   would point out were not contradicted by a converting

10  declaration from Mr. Hawks, or for that matter anyone else from  15:11:31

11  CBRE in terms of what his state of mind was, what he understood

12  his position to be -- that those provisions, given the standard

13  that's applied, similar to that at summary judgment, must be

14  construed in the light most favorable to Mr. Ortiz.

15       So our argument, Your Honor, in summary, with regard        15:11:55

16  to the enforceability of the 2016, and for that matter that

17  would arguably be the same in 2015, but for the arguments we've

18  made, that shouldn't apply because the claims didn't arise

19  during that period of time.

20       And *Duenas* talked specifically about subsequent          15:12:12

21  arbitration agreements arising after the fact under Arizona law

22  are not enforceable for subsequent events.

23       But the sum and substance of it is that in construing

24  this in the light most favorable to Mr. Ortiz, we believe we've

25  met our burden on the procedural unconscionability issue.  And   15:12:33

1    for that reason should -- it should be found not to be

2    enforceable and arbitration should not be compelled.

3        If the Court would like for me to speak briefly to the

4    motion to stay, I have just a couple of summary comments to

5    make on there that are not as detailed as the ones I just made                    15:12:55

6    on the unconscionability argument.

7        THE COURT:  Let's pause on unconscionability.

8        I understand your point about *Cooper*, but one of the

9    cases that is cited on the tentative on the page before that is

10   the *Underwood versus Chapman Bell Road* case.  And that case                     15:13:10

11   seems to me an even better analog than *Cooper*.

12       There was an employee, it was in the employment

13   context, also the plaintiff in that case had a limited

14   education, not much business experience.  In that one the

15   plaintiff arguably had even less time to examine the contract                     15:13:31

16   or the arbitration clause than Mr. Scott-Ortiz did, because the

17   case states that it was given to the employee in the middle of

18   the day, in the middle of a busy work day to sign, and the

19   person didn't even know what arbitration was.

20       But in that case Judge Campbell rejected the                                  15:13:48

21   procedural unconscionability challenge, and one of the things

22   he focused on was, arbitration clauses are pretty typical in

23   employment contracts.

24       And I'll give you a chance to respond in a second, but

25   just kind of where I'm thinking is, to me it's notable that                       15:14:07

1    *Cooper* wasn't an employment case.  It had to do with a payday

2    lending situation and changing the terms of this loan

3    agreement.

4           The reason I mention that is because some of the other

5    cases that are discussed in the tentative is also                      15:14:20

6    Judge Campbell's order in the *Edwards* case where it talks

7    generally about procedural unconscionability.  It doesn't

8    really turn on whether one party had bargaining powers, going

9    through a rough patch or things like that.  Fundamentally, even

10   if they don't agree with what's in the agreement -- or don't          15:14:40

11   understand it, the agreement may be enforceable if it's

12   consistent with reasonable expectations and not unduly

13   oppressive.

14          And that concept of consistent with reasonable

15   expectations is something that I thought a lot about before           15:14:53

16   coming out with this tentative, because it just seemed to me

17   when looking at the case law that time and time and time again

18   courts have found that in the employment context arbitration

19   clauses in the employment contract between the employer and the

20   employee are pretty standard.                                          15:15:11

21          And given their ubiquity, that really makes it an

22   uphill climb for a plaintiff trying to mount a procedural

23   unconscionability challenge in the employment context just

24   because it's hard to say any particular employee was unfairly

25   duped when these things are so standard.                               15:15:28

1          And so can you talk about that and why your case

2    should lead to a different outcome than what happened in the

3    *Underwood* case?

4          MR. BONNETT:  Sure, Your Honor.  This is Dan Bonnett.

5    Yes, thank you.                                              15:15:45

6          I think that the one point here that I would say

7    probably distinguishes the two cases that Your Honor just

8    mentioned is that here the mechanics of how this was presented

9    to Mr. Ortiz, and sort of the steps that he went through, need

10   to be analyzed in the context of what was going on with him   15:16:07

11   personally, essentially how he viewed this.

12          Although he didn't say it, I'm paraphrasing, he

13   basically was being thrown a financial life preserver here by

14   CBRE because he was seven months out of work and suffering

15   from what he described as a substantial financial hardship.   15:16:27

16          So the bargaining process here still is one that needs

17   to be examined in the context of whether there was a true

18   meeting of the minds in terms of understanding what was going

19   to be expected of him in the context of accepting the offer of

20   employment, and understanding that he was going to be subject  15:16:52

21   to an arbitration agreement under these conditions where he was

22   told he needed to be available immediately.  Mr. Hawks needed

23   him right away.  That in order for that to happen he had to

24   order a uniform, the uniforms couldn't be ordered until he went

25   online and clicked accept on the offer.  And he did that.  And 15:17:13

1    he did that because he needed the work.

2          So understanding that there some actual conscious

3    meeting of the minds here is what I think distinguishes this

4    case from the other two cases that were cited, because there

5    wasn't a hard document put down in front of him and he wasn't          15:17:37

6    told, take your time, get this back to me by the end of the

7    day, let me know -- if you have any questions about

8    arbitration, Alexis, let me know what they are.

9          There is a reference in the offer letter that if you

10   have questions about the offer letter contact -- contact or you          15:17:55

11   can call this number.  But that doesn't overshadow the

12   circumstances that he was confronted with personally, and what

13   was being told to him by Mr. Hawks about the need to get

14   somebody in.

15         We don't know, because there's been no controverting          15:18:16

16   evidence presented by the defendants, why Mr. Hawks needed him

17   there immediately.  We don't know if Mr. Hawks was under

18   pressure from his supervisors to get somebody hired and get

19   them in there.  But certainly that was what Mr. Ortiz took away

20   from the conversation, is there was an immediate need on the          15:18:35

21   part of both parties to get this done quickly, and as quickly

22   as possible so that he could get in there and start working.

23         And that wasn't a benefit apparently just to

24   Mr. Ortiz, it was one equally to the defendant here.

25         So looking again at all of the cases that talk about          15:18:55

1    looking at the totality of the circumstances, we think it's

2    distinguishable for that reason.

3            And I don't know if I completely answered Your Honor's

4    question, but I think that's what makes this case different.

5            THE COURT:  I think I understand your position.                    15:19:09

6            The final question I have is, isn't it relevant

7    here -- this isn't something that is really brought out in the

8    tentative, but is it relevant at all and doesn't it hurt your

9    position that this wasn't the first time that Mr. Scott-Ortiz

10   reviewed and then signed a contract that had an arbitration          15:19:29

11   agreement?  He also did it in 2013.  Doesn't that kind of hurt

12   your position that this is the type of agreement that is not

13   consistent with the reasonable expectations and it was unfairly

14   sprung on him?

15           MR. BONNETT:  It may have some bearing on -- candidly         15:19:48

16   on the issue of credibility.  But I think, again, he explains

17   in his declaration, and there's no -- there's no evidence that

18   has been presented at this point to the contrary, that he

19   didn't know what arbitration means.

20           I would have to say that many folks, including               15:20:10

21   myself -- and this is not an excuse, it's just a reality --

22   don't read some of these things.  When I download a new app on

23   my phone and it has eight pages of stuff I'm supposed to read

24   and accept, it just doesn't happen.

25           And I think that was the case for Mr. Ortiz.  And            15:20:31

—— CV-20-238-PHX-DWL – November 17, 2020 ——

1    that's why things like age, educational experience, business

2    acumen, prior familiarity with the type of work he did as a

3    laborer, a mechanical and manual laborer, is different perhaps

4    from somebody that's maybe an office administrator whose job is

5    to read documents daily, or whose part of their responsibility            15:20:54

6    is to take the time and parse language in papers that come

7    across their desk.  But that wasn't this plaintiff.

8              THE COURT:  All right.  I don't have anymore questions

9    concerning procedural unconscionability, if you want to turn to

10   the stay.                                                                  15:21:13

11             MR. BONNETT:  Thank you, Your Honor.

12             Again, I don't want to rehash what's already been

13   briefed and what has -- or the takeaways I have from your

14   tentative ruling.  I do think, however, that one of the things

15   that the plaintiff is concerned about if this goes to                     15:21:27

16   arbitration is the ability to ensure that the arbitrator

17   appreciates the significance of the EEOC process, what a

18   favorable cause determination ruling may have in the context of

19   his claims, and the admissibility of that document.

20             And while the arbitrator certainly has discretion to            15:21:57

21   consider all those things, there's nothing to ensure how that

22   discretion would be exercised, or an ability to have it

23   reviewed for an abuse of discretion.

24             That, frankly, is one of the things that was pointed

25   out in the *Marie versus Allied Home Mortgage* case we cite in            15:22:16

1    our reply at document 25, at page 6, that while the arbitrator

2    has broad discretion whether to grant a stay, as the Court

3    suggests, or consider these other factors, there's no

4    possibility of review, and there's no assurance that what the

5    defendant's position would be with regard to a stay that's made          15:22:43

6    before the arbitrator at that time.

7            And on the balance of the factors that are considered

8    with regard to whether a stay should be granted or not, while

9    the defendants address most of the arguments that we raise, I

10   don't believe they did, or if they have I overlooked it, any            15:23:03

11   showing of hardship to CBRE by granting a stay while the EEOC

12   conducts and completes its investigation.

13           THE COURT:  And just to follow up on that, this was

14   one that I'm frankly pretty torn on, because I think there are

15   all sorts of reasons why it would be helpful for the                    15:23:25

16   administration of justice in having a fair outcome for

17   everybody in this case to hit the pause button, sort of

18   effectively, before it gets to arbitration, to make sure that

19   all of his remedies are preserved.

20           The thing that I'm just struggled with is when you              15:23:45

21   look at the actual text of the FAA, if I can just paraphrase

22   it, it's -- a District Court's role is really limited in a case

23   involving a valid arbitration agreement.  You need to look to

24   see if there is an agreement to arbitrate, and if there is, you

25   got to send them to arbitrate.                                          15:24:06

1          So what I'm struggling with is, I recognize that some

2   other courts have issued stays in this circumstance, but I'm

3   struggling to see how that approach is consistent with the text

4   of the FAA, which really seems like, once I find there's an

5   enforceable arbitration agreement, I shall grant the -- issue          15:24:23

6   the order compelling arbitration, because that's what my

7   limited role is to do.

8          MR. BONNETT:  This is Dan Bonnett, Your Honor.

9          I understand that.  I guess I too am struggling with

10  the notion of the jurisdiction of the Court to control its          15:24:43

11  docket in the manner in which its cases proceed, and the

12  overriding desire that all litigants and courts have to ensure

13  that justice is appropriately administered, and that actions

14  taken are not unduly prejudicial to any of the litigants.

15         And I think the cases we point out here have explained          15:25:13

16  what the potential harm is to Mr. Ortiz by not letting the EEOC

17  process play itself out.

18         And although I have not found a case that suggests or

19  expressly holds that there's a balancing test that should be

20  employed here, I think it's within the inherent authority of          15:25:37

21  the Court to do that, and under these circumstances, to stay

22  the case without prejudice to any of the parties for the

23  reasons that we've cited.  And I think most of those were

24  addressed in our reply memorandum.

25         THE COURT:  All right.  Thank you.          15:25:56

1          Do you have anything else you'd like to address before

2     I turn to CBRE?

3          MR. BONNETT:  I do not, Your Honor.  Thank you.

4          THE COURT:  All right.  Thank you.

5          MR. HENDRICKS:  Your Honor, R.J. Hendricks with Morgan     15:26:06

6     Lewis on behalf of CBRE.

7          Let me address the issue of unconscionability first

8     and the issue of procedural unconscionability.

9          I think Your Honor is correct, even if we take

10    plaintiff's suggestion that you look at the particular facts     15:26:26

11    involved in this case to make that particular judgment, the

12    fact is is that Mr. Scott-Ortiz was a high school graduate.  He

13    has taken some college courses.  He's not 18, 19, he's in his

14    thirties.  He's an adult.

15         He actually logged into the system, which required him     15:26:44

16    to process what was being presented to him in terms of entering

17    his password, navigating through the system.  He had no

18    difficulty with respect to that.

19         And despite all of what we would characterize as

20    self-serving sort of statements now, the offer letter is not     15:27:03

21    some sort of offer letter or a legal document, as the Court

22    points out, in the context of a loan agreement or a payday loan

23    sort of service.  It is a routine agreement arising in the

24    context of employment, an employment relationship.

25         It is absolutely critical that this was not the first     15:27:24

1    time that he had done that.  And so there's -- there is a

2    pattern and a course of dealing here where CBRE is being

3    perfectly predictable in what's being expected.

4        During the last period of his employment he had an

5    arbitration agreement.  He had to agree to that.  He did so.    15:27:43

6    He signed it.  In this phase of his employment agreement, as

7    his employment, he had an arbitration agreement.  There was an

8    offer that was sent.  He read it.  He logged in, he signed it,

9    accepted its terms.

10       And I want to be clear about what was stated in the        15:27:56

11   offer letter.  He said, oh, gee, I was forced to do this.

12   There's no indication of any sort of compulsion or forcing by

13   CBRE.  There's no indication that CBRE dictated when he logged

14   into the system, and when he read it and when he acknowledged

15   it.  And in the offer letter it states, if you have any         15:28:16

16   questions, please do not hesitate to contract your hiring

17   manager, and it gives a phone number, and it also says, "or

18   Jeffrey Hawks at CBRE.com."

19       So he was directed back to the very person he had the

20   conversation with, Mr. Hawks.  And he could have at any point   15:28:31

21   said, you know, what is this arbitration thing I see here?  I

22   don't remember seeing that before.  Could you explain to me

23   what that is?  I don't think I want to do that.  Do you think I

24   could do something else?

25       He had the opportunity.  That opportunity was             15:28:45

1    presented to him.  And that's another distinguishing factor

2    here.

3          The fact is is that everything that CBRE did with

4    respect to this is consistent with reasonable expectations.  It

5    is an employment arbitration agreement that Mr. Scott-Ortiz is      15:28:57

6    presumed to have read and understood the agreement by signing

7    it.  He's an adult.  He has the ability to enter into binding

8    contracts.

9          This Court should not invite the invitation of

10   plaintiff's counsel to treat Mr. Scott-Ortiz as a child who        15:29:15

11   lacks capacity.  He has capacity.  And on two occasions back in

12   2013 and in 2016 he signed valid, binding agreements,

13   arbitration agreements.

14         So there is no inference whatsoever that he was

15   surprised by this, that CBRE in some fashion took advantage of     15:29:33

16   him with respect to the agreement, that in fact he was denied

17   the opportunity to ask questions.  He was invited to ask

18   questions.  This is not some sort of 18-page agreement in small

19   font.  This is an agreement that specifically set out in a

20   distinct section the arbitration provision, and he agreed to       15:29:51

21   it.

22         So we appreciate the notion of looking at the

23   particular facts.  We think that if you do that, the facts as

24   presented are consistent with the tentative ruling.  There was

25   no procedural unconscionability.                                   15:30:07

CV-20-238-PHX-DWL – November 17, 2020

1        And the move of the case law does not turn every

2   arbitration sort of motion into such an individualized process

3   where basically people who sign these agreements can come back

4   after the fact, assert self-serving information, not really

5   pointing out any sort of oppression or abuse by the employer,          15:30:30

6   but things that are in their mind, gee, I needed a job badly,

7   gee, I didn't read it.  That's a self-serving statement.  He

8   acknowledged having read it.  He acknowledged and agreed to the

9   agreement.

10        So the thrust of the case law is to enforce these.          15:30:47

11   CBRE's agreements have been enforced in the past.  And the

12   particular facts of this situation support enforcement, that

13   this -- there was no surprise, and there was no procedural

14   unconscionability.

15        Now, as to the issue of the stay --          15:31:03

16        THE COURT:  Let me just -- let me just pause you right

17   there because I have just a little bit to follow up on.

18        So you used the phrase self-serving several times.  I

19   understand that that's your position on his factual statements

20   about what he was going through when he signed the agreement.          15:31:21

21   But don't I need to resolve all the disputed facts in his

22   favor, given the standard of review here?

23        Litigant's statements are self-serving all the time,

24   but there's no rule that I'm aware of that the Court

25   automatically rejects a litigant's self-serving statement          15:31:39

1   irrespective of the standard of review or the posture of the

2   case.

3       MR. HENDRICKS:  I don't think that you reject them,

4   and I don't mean to suggest that by my statement.  I think even

5   if you include them, even if you consider them, which I                    15:31:53

6   understood the Court to have done in reaching its tentative,

7   those statements were not enough.

8       I do think that, just looking at where the case law is

9   going -- and when you speak to this issue of consistent with

10  reasonable expectations, that is taking the standard to a more             15:32:09

11  objective notion as opposed to a purely subjective notion.  And

12  it's talking about, you know, whatever facts you present, they

13  need to be something very extraordinary to meet the high

14  burden.  And we cite the cases that speak to that, of not

15  enforcing an arbitration agreement.                                         15:32:31

16      So that's the only point that I make.  And that is

17  that, yeah, consider all of the objective facts, the facts that

18  an arbitration agreement was presented.  You can include his

19  individual circumstances, but as the Court noted in the

20  tentative, those sort of particular characteristics, you know,             15:32:47

21  are not really either controlling.

22      Here you have an agreement that was presented to

23  him.  He was given an opportunity to read it.  In this

24  particular context, this was the second arbitration agreement

25  he had.  He had one back in 2013 when he was initially                      15:33:03

—CV-20-238-PHX-DWL – November 17, 2020—

1    employed.  And then when he reapplied for a new position, there

2    was another.

3        Those are very specific objective facts that go to

4    this notion that this is not a surprise.  And the agreement is

5    fundamentally the same in 2016 as it was in 2013.  There was          15:33:21

6    really only one change, as the Court pointed out to, and that

7    is it speaks to the FAA controlling versus the local state's

8    arbitration rules controlling.  That's the only difference.

9        So we understand that those facts can be considered,

10   but I don't believe that the case law would deem those facts as      15:33:40

11   being dispositive.  I think, in fact, the trend of the case law

12   is that they are not.  What's dispositive is, he was given the

13   agreement, he had an opportunity to review the agreement, he in

14   fact went into an electronic system that caused him to take

15   affirmative actions indicating that he was signing in, it's          15:33:57

16   him, that he's reviewed it, that he agrees with it.

17       And another critical particular fact in this case is

18   the offer letter did specifically say, if you have any

19   questions, go back and talk to your hiring manager.

20       So all of these statements about what the hiring              15:34:13

21   manager said and what he didn't understand, to the extent any

22   of that was inconsistent, he was given a further opportunity to

23   go back and clarify with that hiring manager exactly what this

24   was all about.

25       And by his own -- there's a lack of any indication in          15:34:26

1    his declaration that he went back and asked those questions.

2    In fact, his declaration creates the impression that he didn't

3    take advantage of that opportunity.

4        So when I say self-serving, I'm saying, well, when

5    given the opportunity to ask those questions in real time,          15:34:44

6    having the opportunity to review the document, having

7    apparently not done so, to come back now and say, well, the

8    fact that I didn't do so or I had a particular understanding,

9    you know, again, we don't believe that that should control the

10   outcome here.                                                        15:34:58

11       The objective facts here support that this was not a

12   surprise, he was not procedurally unconscionable, and this

13   agreement is enforceable.

14       And there's not been a presentation of specific facts

15   that meet that high hurdle of demonstrating true unfairness,        15:35:13

16   true surprise on the part of the plaintiff.

17       THE COURT:  All right.  Thank you.

18       MR. HENDRICKS:  So with respect to the issue of the

19   stay, again, our -- we agree with the Court in its assessment

20   that the FAA creates a very narrow framework here.  This Court      15:35:33

21   is asked under the FAA to determine whether or not we have a

22   valid agreement to arbitrate.  And if we do, whether the

23   agreement encompasses the dispute.

24       There's no disagreement here that the agreement

25   encompasses the dispute.  And we believe the Court's correct        15:35:53

CV-20-238-PHX-DWL – November 17, 2020

1    with respect to it being a valid agreement.

2          Under those circumstances, pursuant to the FAA, the

3    Court shall compel arbitration.

4          At this juncture, again, we argue that the Court

5    should dismiss for lack of jurisdiction.  We're fine with the          15:36:08

6    Court's distinction of compelling the arbitration and staying

7    the case pending resolution of the arbitration.

8          But, again, the notion that we would even stay the

9    initiation of the arbitration would fundamentally deny us the

10   benefit, and it could be reversed in some other circumstance,          15:36:32

11   deny the parties the benefit of its bargain.  The intent of

12   arbitration is to be efficient, is to be relatively quick.

13         Here the EEOC has had a charge for some time.  It's

14   not concluded its investigation.  Despite the suggestion that

15   it might be a favorable outcome, there's no assurance as to           15:36:51

16   that at all.  We believe that the outcome would be favorable to

17   us.

18         But even if it's not, the point is is that we should

19   not be in a position of waiting an indefinite period of time

20   for a third-party agency to conduct its initial investigation,        15:37:06

21   which may or may not have particular bearing on resolving this

22   particular dispute before us.

23         You know, the reality of it is is that we could

24   resolve Mr. Scott-Ortiz's dispute and the agency could still,

25   for whatever reasons it has, pursue other sorts of issues or          15:37:27

1    not.

2           So in the notion -- in the context of this case, where

3    we have a valid agreement, where the claims could fall within

4    it, in terms of this Court's function under the FAA, it should

5    pursuant to that compel arbitration.                                    15:37:44

6           All of the arguments that plaintiff wants to make with

7    respect to the management of the arbitration, the timing and

8    sequence of how things are litigated, whether there is a stay

9    of the arbitration itself, those things can be addressed with

10   the arbitrator.                                                         15:38:03

11          And the suggestion that plaintiff wants a guarantee of

12   the stay, that's putting sort of the thumb on the scale in the

13   sense that plaintiff's not guaranteed any particular outcome.

14   And the fact that in this instance, by virtue of his agreement,

15   it will be an arbitrator that makes that scheduling decision            15:38:22

16   versus the Court, well, that's the natural outcome of being a

17   part of arbitration.  Arbitrators set their arbitration

18   schedule, and there will be a whole scheduling order, and all

19   of these arguments can be addressed there.

20          The plaintiff is not deprived of the ability to                  15:38:37

21   advocate a request for a stay.  He's not being deprived of his

22   ability to even obtain a stay through the arbitration process.

23   If we delay for an indefinite period of time, employees come

24   and go, people's memories fade.  There are a whole host of

25   things that can change in the record, and we're being denied           15:38:57

1   the fundamental benefit of arbitration, which is a relatively

2   quick, expeditious, concise sort of process.

3          So we believe the case law supports the position of

4   the Court here, its tentative, that the initiation of

5   arbitration should be compelled, and that any sort of stay of          15:39:13

6   those proceedings should be done by the arbitrator.

7          In terms of the civil case, the Court can stay that

8   pending resolution of the arbitration.  And we think that would

9   harmonize and be perfectly consistent with the requirements of

10  the FAA.                                                               15:39:32

11         THE COURT:  All right.  Just a question on that stay

12  point.

13         Do you think -- do you think that I have discretion to

14  stay my issuance of the order compelling arbitration, but I

15  should decline to exercise that discretion and send everybody          15:39:46

16  to arbitration right away, or is it your position that I don't

17  even have discretion to do that, and it's mandatory that I send

18  the parties to arbitration now, and I have no say in the

19  matter?

20         MR. HENDRICKS:  Our position is is that it's mandatory          15:40:02

21  and the Court does not have that discretion --

22         THE COURT:  All right.

23         MR. HENDRICKS:  -- under the FAA.

24         THE COURT:  So the cases that Mr. Scott-Ortiz has

25  cited in his motion, where other courts have considered stay           15:40:13

1   requests, is it your position that all those courts got it

2   wrong when they considered staying actions for the types of

3   reasons that are being discussed here?

4           MR. HENDRICKS:  My memory of it is that those cases

5   did not involve the same pattern.  I mean, in the generic sense    15:40:29

6   the Court has generically authority to stay cases generally.

7   But my memory of the cases that he cited, arbitration had not

8   been initiated, and it wasn't a situation where

9   arbitration -- the court was staying arbitration.

10          You might have cases where the court directs             15:40:47

11  arbitration and is staying further proceedings in the civil

12  case pending the resolution of that.  But I candidly don't

13  recall seeing a case cited that -- where arbitration -- where a

14  court concluded there was a valid arbitration agreement that

15  covered a claim and it nonetheless stayed the case for some      15:41:06

16  other -- for some other reason.  That's not my memory of the

17  cases.

18          If I'm remembering them incorrectly, I apologize for

19  that, but that's not my memory of the authorities.

20          THE COURT:  Okay.  Thank you.                            15:41:22

21          Is there anything else you'd like to address?

22          MR. HENDRICKS:  The only thing I would address is,

23  even if it were discretionary, again, on the equities, I don't

24  believe -- which I don't believe that it is, but even if it

25  were, I don't believe on these equities that that would be       15:41:35

1    warranted.

2         Mr. Scott-Ortiz filed his case.  He initiated the

3    litigation.  That's a choice that he made.  It implicated the

4    rights under the arbitration agreement.  We should be able to

5    benefit from those rights and have arbitration begin.  If                    15:41:51

6    that's not the case, then we're being denied the very benefit

7    of an expeditious sort of arbitral resolution of the claim

8    here.

9         And both parties can argue their respective positions

10   as to whether a stay should occur with the arbitrator.                       15:42:12

11        So in terms of balancing the equities, even if there

12   were discretion, given that there is a valid arbitration

13   agreement, given that it covers the scope of these claims,

14   that decision should be a part of the arbitration process on

15   the equities as compared to the court system.  Especially when                15:42:29

16   dealing with an indefinite administrative process with the

17   EEOC on claims that are currently not even before the EEOC.

18   These are his Section 1981 claims, these are not Title VII

19   claims.

20        So that would be our position there.                                    15:42:46

21        THE COURT:  All right.  Thank you.

22        All right.  Mr. Bonnett, final word.

23        MR. BONNETT:  Thank you, Your Honor.

24        A couple of things that counsel said that I'd like to

25   just respond to or reply to.                                                 15:42:58

1    First of all, regardless of what the arguments are

2  with regard to the expectancy of CBRE to move forward quickly

3  to resolve the Section 1981 claim, the Title VII claim is still

4  out there.  And however long it takes the EEOC to complete its

5  investigation and either issue a notice of right to sue or          15:43:20

6  initiate its own enforcement action in the name of the EEOC

7  against CBRE, they're going to have to litigate that issue at

8  some point in time.

9    So I think it's a bit of a red herring to argue that

10  there's some prejudice here that works to the disadvantage of       15:43:39

11  CBRE by not -- simply by not moving the arbitration forward if

12  on balance there are reasons not to do that.

13    Secondly, with regard to what to expect from the

14  arbitrator, none of us have a crystal ball what the arbitrator

15  will do if the arbitrator is asked to stay.  But I think we all     15:44:03

16  are educated enough to realize that arbitrators get paid

17  because of the work they do.  They don't get paid if they're

18  not working.

19    So I don't know who the arbitrator would be, and none

20  of us know who that would be.  But certainly I don't think it's     15:44:19

21  beyond the pale to envision that there's certainly a monetary

22  incentive for the arbitrator to want to move ahead with the

23  arbitration as opposed to not moving ahead with the

24  arbitration.  And that's one of the concerns that factors into,

25  I think, the conclusion that the First Circuit reached in the       15:44:38

1    *Marie* case that we cited.  And certainly all of the cases that

2    we cited in our reply where courts that have exercised the

3    discretion to enjoin arbitration are set out on page 3 of our

4    reply.  I don't need to repeat all of those for the benefit of

5    the Court or counsel.                                          15:45:00

6            Counsel also made a couple statements that I just want

7    to make sure that I didn't misunderstand what was being said.

8    But to the extent what was said was that Mr. Ortiz agreed with

9    the arbitration language, I don't think there's anything that

10   I've seen in the record that says he agreed to it.  I think at  15:45:19

11   best the argument is that he accepted the offer letter.  But to

12   imply that he consciously agreed to arbitrate I think misstates

13   the record.

14           Also I'm a little bit concerned about the conflating

15   the argument here of employing some sort of an objective        15:45:39

16   standard rather than a subjective standard.  I don't think

17   that's what the cases stand for.  And to the extent an

18   objective standard is applied, it suggests that the Court

19   engage in some sort of credibility determination and weighing

20   of evidence, which the Ninth Circuit has repeatedly said is not  15:46:03

21   appropriate at the summary judgment stage.  And that's the

22   standard that applies for purposes of determining the issues

23   that is before this Court now, we would advocate that equally

24   that's not the appropriate standard.  You have to look at

25   specific facts and resolve them to the extent they can be       15:46:24

1    credibly –– to the extent they can be resolved.  And when in

2    doubt that doubt has to be construed in the light most

3    favorable to Mr. Ortiz.

4         And finally, the argument that he could log on to and

5    go through the portal to access and click on accept on the                    15:46:46

6    computer is also a bit of a red herring.  My six-year-old

7    nieces can log on a computer and navigate some things.  But

8    when they get to the end of whatever it is they're looking at,

9    my guess is if it was the offer letter in front of them, they

10   wouldn't understand what the arbitration agreement meant even                  15:47:10

11   if they read it.

12        So I just sort of think, again, the important factor

13   here to look at is the totality of the facts as the Arizona

14   state cases suggest are to be taken into consideration in

15   determining whether or not there was a meeting of the minds.                   15:47:32

16   And for the reasons we've stated, we just don't think that

17   that's the case here.

18        THE COURT:  All right.  Well, thank you very much to

19   all the parties for their arguments here today.

20        I will be taking this under advisement.  I've got a                       15:47:48

21   lot to think about based on what everybody's said here in the

22   hearing today.  But I hope to finalize the order relatively

23   soon, I hope in the next week or so, and get it out.

24        And so with that, unless the parties have anything

25   else they'd like to raise today, this hearing is adjourned.                    15:48:06

1          Thank you.

2          MR. HENDRICKS:  Thank you, Your Honor.

3          MR. BONNETT:  Thank you, Your Honor.

4      (Proceedings concluded at 3:48 p.m.)

5

6                         -oOo-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                       C E R T I F I C A T E

5

6           I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9           I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14           DATED at Phoenix, Arizona, this 22nd day of December,

15   2020.

16

17

18

                              s/Candy L. Potter_____
19                            Candy L. Potter, RMR, CRR

20

21

22

23

24

25

UNITED STATES DISTRICT COURT